Garry M. REHN, Respondent,

· v.

Barbara FISCHLEY, Defendant and Third–Party Plaintiff, Petitioner, Appellant,

v.

GREATER ANOKA COUNTY ANIMAL HUMANE SOCIETY, Third–Party Defendant, Petitioner, Appellant.

No. C0–95–813.

Supreme Court of Minnesota.

Jan. 2, 1997.

Robert E. Kuderer, Teresa M. Croke, Johnson & Condon, P.A., Kevin P. Keenan, Charles E. Lundberg, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for appellant.

William Starr, Starr & Fleagle, P.L.C., Charles A. Beckjord, Charles A. Beckjord, Attorneys at Law, Minneapolis, for respondent.

Jeffrey D. Hedlund, Faegre & Benson, L.L.P., Minneapolis, amicus curiae.

## OPINION

TOMLJANOVICH, Justice.

Appellants, Dr. Barbara Fischley and the Greater Anoka County Animal Humane Society ("Humane Society"), seek review of the court of appeals' reversal of the trial court's

directed verdict in favor of Dr. Fischley. Respondent Garry M. Rehn claimed he was injured after using formalin to disinfect cat cages at the Humane Society in January 1993. Rehn alleged that Dr. Fischley was negligent in: 1) recommending the use of formalin to the executive director of the Humane Society; 2) providing the formalin to the executive director of the Humane Society; and 3) in failing to provide adequate warnings and directions regarding the dangers and safe use of formalin.[1] Fischley filed a third-party complaint against the Humane Society for contribution or indemnity alleging that if Rehn was injured by the formalin, his injuries were caused in whole or in part by the negligence of the Humane Society. The trial court granted appellants' motion for directed verdict on the grounds that Dr. Fischley's actions were within her official duties as an unpaid member of a nonprofit corporation's board of directors and therefore were protected by Minnesota Statutes section 317A.257.[2] A divided panel of the court of appeals reversed and remanded the case for a new trial on the grounds that Dr. Fischley had not met her burden of proving that her actions were within the scope of her official duties as an unpaid member of the Humane Society's board of directors. We reverse and reinstate the directed verdict of the trial court.

The facts are undisputed. Dr. Fischley became a member of the Humane Society's board of directors in November 1992. A licensed veterinarian, she joined the board after the head of the Minnesota State Board of Veterinary Examiners asked her to serve on the board as an advisor, largely because the Humane Society was experiencing problems, including poor infectious disease control.

In December 1992, Greater Anoka County Humane Society executive director Jana Webster–Vaughn[3] learned that two kittens

1. Rehn also alleged that Dr. Fischley's actions constituted veterinary malpractice. The trial court dismissed the claim and the court of appeals affirmed. The issue is not before this court.

2. In the alternative, the trial court also dismissed the claim for failure to warn, stating that Dr.

Fischley owed no duty to Rehn. The court of appeals reversed, stating that Dr. Fischley indeed had a duty to warn. However, the issue is not before this court.

3. Webster–Vaughn's position as executive director is distinct from Dr. Fischley's position as a member of the board of directors. Webster–

from her facility had tested positive for pan-leukopenia, a virus commonly known as feline distemper.[4] Webster–Vaughn then called Dr. Fischley to find out how to disinfect the cages at the Anoka County facility. Webster–Vaughn testified that she placed the call only because of Dr. Fischley's status as a board member. Dr. Fischley then read verbatim to Webster–Vaughn the following passage from a veterinarian textbook:[5]

> The virus is resistant to trypsin and most disinfectants but can be inactivated by 0.5% formalin or 1-to-32 dilution of commercial hypochlorite solution.

Neither Webster–Vaughn nor Dr. Fischley knew that hypochlorite solution consisted of hypochlorous acid, a solution used as a bleaching and oxidizing agent.[6] Dr. Fischley later admitted she did not know that formalin was unsafe as a surface disinfectant. Thus, Webster–Vaughn testified that Dr. Fischley left her with the impression that the only available option for disinfecting the cat cages was the surface application of formalin, which is a buffered 10 percent solution of formaldehyde.[7] Webster–Vaughn then asked Dr. Fischley where she could acquire some formalin and Dr. Fischley offered to provide some to the Humane Society. Dr. Fischley warned that she had observed people experiencing headaches and nausea while using formalin and recommended that only one person use the formalin at a time, and that the person's skin and face be covered during use.

At this time, respondent Garry Rehn was working at the Humane Society as a veterinarian technician assistant. At the direction of Webster–Vaughn, Rehn and veterinarian technician Elizabeth Hult went to Dr. Fischley's office to pick up the formalin. Dr. Fischley was not there, but her assistant, who also is a veterinarian, provided the for-malin in a distilled water jug with the words "10% formalin" written on the side. Hult subsequently wrote the words "Do not inhale, wear gloves, mask when using, careful, harmful" on the side of the jug. Rehn subsequently scribbled out the words "distilled water" from the side of the jug. At no time did either Dr. Fischley or the Humane Society distribute directions for the use of formalin, as required by OSHA regulations.

A few days later, Rehn volunteered to clean the cages using the formalin. He wore yellow Platex-like gloves and asked Webster–Vaughn for a mask but was told to wear a towel over his face, which he did. Rehn prepared the disinfectant by adding two or three squirts of formalin from a syringe into a gallon-sized pail filled with water. He then began cleaning one of the rooms by applying the formalin solution directly to the surface of the walls and floor with towels. About two or three hours later, Rehn expressed concern to Webster–Vaughn that the dilution rate was not strong enough. Upon her suggestion, Rehn then phoned Dr. Fischley at her office. Fischley testified that she read him the same instructions she had read Webster–Vaughn. Dr. Fischley said she then refused to give any further advice and told Rehn to speak with his supervisor regarding the appropriate dilution rate. Without any more consultation with either Dr. Fischley or Webster–Vaughn, Rehn added three more squirts of formalin from a little syringe and one more squirt of formalin from a bigger syringe into the pail and cleaned the room again. He repeated this process more than once during the day. He then worked on another room for approximately four or five hours.

At the close of plaintiff's case in chief, Dr. Fischley moved for a directed verdict on the

Vaughn is a salaried officer of the nonprofit corporation, whereas Dr. Fischley is an unpaid member of the board of directors.

**4.** Panleukopenia is a virus that mostly affects the digestive tract of cats. The virus causes vomiting, diarrhea, is highly infectious, and is fatal in a high percentage of cases.

**5.** Dr. Niels C. Pederson, *Feline Infectious Diseases* 15 (1988).

**6.** Sodium hypochlorite is commonly known as household bleach.

**7.** An expert testified at trial that both formaldehyde and bleach are irritants and can have short-term effects. But formaldehyde can cause permanent lung damage through small exposures to low concentrations. Bleach, on the other hand, would cause permanent lung damage only if used in very high concentrations.

basis of.Minnesota Statutes section 317A.257, which reads in part:

> Except as provided in subdivision 2, a person who serves without compensation as a director, officer, trustee, member, or agent of an organization exempt from state income taxation under section 290.05, subdivision 2 * * * is not civilly liable for an act or omission by that person if the act or omission was in good faith, was within the scope of the person's responsibilities as a director, officer, trustee, member, [or] agent, * * * and did not constitute willful or reckless misconduct.

Minn.Stat. § 317A.257, subd. 1 (1996). Subdivision 2 includes two parts. Subdivision 2(a) enumerates four specific exceptions, none of which are applicable here. But subdivision 2(b) describes a limitation upon the statute's protection for physical injury: [8]

> Subdivision 1 does not limit an individual's liability for physical injury to the person of another or for wrongful death that is personally and directly caused by the individual * * *.

Minn.Stat. § 317A.257, subd. 2(b) (1996). In his motion for a new trial, Rehn argued that section 317A.257 is an affirmative defense and that Dr. Fischley waived her rights under the statute by failing to plead the defense in her answer. Dr. Fischley argued that the defense was a statutory immunity and, therefore, could not be waived. Both the trial court and court of appeals agreed that section 317A.257 is an affirmative defense, but the trial court allowed Dr. Fischley to amend her answer to include the defense because Rehn waived his objection by arguing the merits of the defense statute at trial. The trial court then granted the directed verdict, holding that Dr. Fischley had proven that her acts of recommending and providing the formalin: 1) were done in good faith, 2) were within the scope of her responsibilities as an uncompensated member of the board of directors, 3) were not willful or reckless misconduct, and 4) did not personally and directly cause physical injury to Rehn. The court of appeals reversed, holding that section 317A.257 did not apply because Dr. Fischley did not prove that her acts of recommending and providing formalin were within her specific responsibilities as authorized by statute or by the corporate charter or bylaws.

## I.

Before we consider the applicability of section 317A.257 to the case at bar, it is important that we classify the protection as either an affirmative defense or an immunity. Although it is not dispositive in this case, the differences between affirmative defenses and immunities are significant for at least two reasons. First, a party waives an affirmative defense if it is not included in a responsive pleading. Minn. R. Civ. P. 12.02 (1994). An immunity, although best included within an answer, is not waived if it is not included in the answer. *See Snyder v. City of Minneapolis*, 441 N.W.2d 781, 788 (Minn.1989) (holding that the statutory limit on damages stated in Minn.Stat. § 466.04 is not an affirmative defense for the purposes of Minn. R. Civ. P. 8.03); *but see Elwood v. County of Rice*, 423 N.W.2d 671, 674 (Minn.1988) (referring to qualified immunity as affirmative defenses); *Peterson v. Knutson*, 305 Minn. 53, 60, 233 N.W.2d 716, 720 (1975) (referring to qualified immunity as an affirmative defense). Second, the application of an immunity typically is a matter of law that is best resolved before the parties engage in lengthy discovery. *See Elwood*, 423 N.W.2d at 675. Affirmative defenses, on the other hand, often require so many factual inquiries that jury issues cannot be avoided. *See SCSC Corp. v. Allied Mut. Ins. Co.*, 533 N.W.2d 603, 611 (Minn.1995) (regarding applicability of an exclusion clause in an insurance contract); *Thiele v. Stich*, 425 N.W.2d 580, 583 (Minn.1988) (regarding assertion of a statute of limitations); *Anderson v. First Nat'l Bank of Pine City*, 303 Minn. 408, 411, 228 N.W.2d 257, 259 (1975) (regarding ratification of a mortgage).

We treat affirmative defenses differently from immunities because they serve different purposes. Whereas an affirmative

---

8. For the purposes of this appeal, appellants stipulated that the use of formalin caused plaintiff physical injury.

defense protects a party from *liability*, an immunity typically protects a party from *suit. Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn.1986). This difference is more than mere semantics. The very foundation of an immunity's protection typically is grounded in the special status of a defendant. The traditional basis for immunity is that "though the defendant might be a wrongdoer, social values of great importance required that the defendant escape liability." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 131, at 1032 (5th ed.1984) (hereinafter "Prosser"). Unlike immunities, however, affirmative defenses "reflect the judgment that the defendant's action is not tortious at all, or if tortious, is morally justified." Prosser § 131, at 1032. In summary, an immunity focuses on the defendant, an affirmative defense on the defendant's actions.

■ It is for these reasons that section 317A.257 grants a statutory immunity. The protection provided in section 317A.257 is not based upon the justification of a defendant's specific actions, but rather upon the defendant's status as an unpaid director, officer, member or agent of a nonprofit corporation. It is true that the statute limits protection to those actions that are: 1) taken in good faith, 2) within the scope of the person's responsibilities, and 3) not willful or reckless misconduct. But the statute does not require that an uncompensated person's actions be legitimate or justified, as is typical with an affirmative defense. Instead, the statute will protect otherwise negligent behavior so long as it is not willful, reckless or in bad faith. Consequently, section 317A.257 provides immunity to those who, by their status as uncompensated persons, qualify for its protection from facing suit.

■ This is not to say that those relying upon section 317A.257 have no facts to prove. Although immunity generally absolves a defendant from the costs associated with defending a suit, the burden remains with the defendant to allege facts sufficient for a court to determine as a matter of law that the immunity applies. Prosser, *supra*, § 132. As this court has stated, "[T]he burden of proof generally rests on the one who seeks to show he is entitled to the benefits of a statutory provision." *In re Application of City of White Bear Lake*, 311 Minn. 146, 150, 247 N.W.2d 901, 904 (1976). Likewise, a defendant relying upon an immunity bears the burden of proving he or she fits within the scope of the immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982) (regarding federal qualified immunity); *Rico v. State*, 472 N.W.2d 100, 104–05 (Minn.1991) (regarding statutory and official immunities); *Elwood*, 423 N.W.2d at 676–79 (regarding official and statutory immunities). Because the statute's purpose is to protect uncompensated persons from suit, its applicability is best determined at the earliest possible point in the proceedings, although a later determination is not fatal. *Elwood*, 423 N.W.2d at 675–76 (regarding qualified immunity under 42 U.S.C. § 1983). In the case at bar, therefore, Dr. Fischley has the burden of proving to the court that her acts of recommending and providing the formalin: 1) were done in good faith, 2) were within the scope of her responsibilities as a member of the board of directors, 3) were not willful or reckless misconduct, and 4) did not personally and directly cause physical injury.

## II.

■ Typically, a motion for a directed verdict presents only a question of law for the trial court regarding the sufficiency of the evidence to present a fact question for the jury to decide. *Midland Nat'l Bank of Minneapolis v. Perranoski*, 299 N.W.2d 404, 409 (Minn.1980). In reviewing a trial court's order for a directed verdict, an appellate court must make an independent judgment about the appropriateness of the directed verdict. *Walton v. Jones*, 286 N.W.2d 710, 714 (Minn.1979). Because the determination of an immunity's application is best decided by the trial court at the earliest possible juncture, however, the trial court's determination necessarily will include mixed questions of law and fact. In this situation, we will correct erroneous applications of law, but accord the trial court discretion in its ultimate conclusions and review such conclusions under an abuse of discretion standard. *Max-*

*field v. Maxfield,* 452 N.W.2d 219, 221 (Minn. 1990).

 It is undisputed that Dr. Fischley at all times acted in good faith,[9] that Dr. Fischley was not compensated for her position as a member of the Humane Society's board of directors, and that Dr. Fischley was asked about the cat cages only because of her status as a board member. Despite these facts, the court of appeals held that Dr. Fischley failed to meet her burden of proving that her actions of recommending the use of formalin and then providing the formalin without adequate warning were within the scope of her responsibilities as a director:

> The fact that an individual wanted respondent to serve as a director so that she could provide advice and the fact that respondent understood and expected the [Executive] Director would call her for advice do not establish that giving advice was within the scope of respondent's responsibilities as a director. The responsibilities of a director are established by statute, articles of incorporation, and corporate bylaws.

*Rehn v. Fischley,* No. C0–95–813, slip op. at 6–7, 1995 WL 731306 (Minn.App. Dec. 12.1995). The court of appeals correctly asserted that a board derives its authority from only two sources: the state via statute or the corporation via its articles of incorporation or corporate bylaws. Minn.Stat. § 317A.201 (1996) (nonprofit corporation); Minn.Stat. § 302A.201 (1996) (for-profit corporation); *see* Harry G. Henn and John R. Alexander, ·*Laws of Corporations* § 207, at 562–63 (3rd ed.1983) (hereinafter, "Henn and Alexander"). Likewise, it is a longstanding tenet of corporation law that a member of the board has no authority to act individually unless specifically authorized by the corporate bylaws or articles of incorporation. *Baldwin v. Canfield,* 26 Minn. 43, 1 N.W. 261 (1879); *see* Henn and Alexander § 208, at 564 (stating that "directors can exercise their management functions only when duly convened as a board"). Consequently, the court of appeals'

holding that Dr. Fischley failed to establish that her individual actions of recommending and then providing formalin were within her responsibilities as a *member of the board* is correct.[10]

 Such a finding does not end the analysis, however. Section 317A.257 protects more than directors. It also protects officers, trustees, members and agents. Were we to adopt the court of appeals' position, a director who decides to donate her individual time will receive no protection because those actions always fall outside the very narrow scope of her technical responsibilities as a director. Meanwhile, a nondirector who decides to donate her time will receive protection because her actions always fall within the broad scope of her responsibilities as either a member or agent of the organization. The legislature certainly could not have intended such an absurd result when it passed this statute in 1989. To the contrary, the amicus curiae points out that the intent of the legislature was to provide a broad protection to all uncompensated contributors. "By listing all of the various 'hats' that volunteers might wear, the statute * * * plainly provides protection to all volunteers, effectively dispensing with the legal formalities (such as what the articles of incorporation or bylaws, if any, might say) regarding their exact role with the charity." Such a reading is consistent not only with the plain meaning of the statute, but with the real world of nonprofit corporations, where corporate structure is often lacking and everybody, from directors to part-time volunteers, typically helps with the most menial of tasks. *See* Daniel L. Kurtz, *Board Liability,* Ch. 3 (1988); Howard L. Oleck, *Non-profit Corporations, Organizations and Associations* § 221, at 506 (3rd. ed.1974) (stating that "Ordinarily, a trustee, director, or officer of a nonprofit organization also may be an employee.") Consequently, we hold that the broad wording of section 317A.257 protects all uncompensated persons acting on behalf of the nonprofit corporation, and not just those uncompensated persons acting within the spe-

---

**9.** Good faith is defined as "honesty in fact in the conduct of an act or transaction." Minn.Stat. § 317A.011 subd. 10 (1996).

**10.** Likewise, the trial court's holding that Dr. Fischley's actions were within her duties as a *director* was incorrect.

cific scope of their duties as defined by their official positions. As a result, a director acting outside the specific scope of his or her duty as members of the board will receive the statute's protection so long as the director is acting on behalf of the nonprofit corporation.

Likewise, we hold that the trial court did not abuse its discretion in finding that Dr. Fischley met her burden of providing facts sufficient to prove that her actions were neither willful nor reckless, and that her conduct, although arguably negligent, did not personally and directly cause Mr. Rehn's physical injuries.

Reversed, the directed verdict of the trial court is reinstated.

PAGE and BLATZ, JJ., took no part in the consideration or decision of this case.